GENERAL ELECTRIC
COMPANY, Plaintiff,

v.

LITTON BUSINESS SYSTEMS,
INC., Defendant.

No. 87–3333–CV–S–4.

United States District Court,
W.D. Missouri, S.D.

June 20, 1989.

James L. Moeller, William F. Ford, Gage & Tucker, Kansas City, Mo., for plaintiff.

Mathew W. Placzek, Joyner, Placzek & Francis, Springfield, Mo., for defendant.

## ORDER

RUSSELL G. CLARK, District Judge.

Plaintiff brought this action against defendant for recovery of costs pursuant to 42 U.S.C. § 9607(a) of the Comprehensive Environmental Response, Compensation & Liability Act of 1980 (CERCLA). This case was tried to the Court without a jury from May 15, 1989 through May 18, 1989. Pursuant to Rule 52, Fed.R.Civ.P., the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Litton Industrial Automation Systems, Inc., Litton Business Systems, Inc., and Litton Industries, Inc., are successors by merger to Royal McBee Corporation, a New York corporation, and its subsidiary Royal Typewriter (hereinafter jointly referred to as "Royal McBee").

2. Royal McBee operated a typewriter manufacturing facility at 2401 East Sunshine Street, Springfield, Missouri, between 1959 and 1965.

3. In 1965, pursuant to an agreement of merger, Royal McBee merged with Litton Industries, Inc. ("Litton"), a Delaware corporation, and Litton became the surviving corporation.

4. At about the same time, the assets and liabilities of Royal McBee were acquired by the Royal Typewriter Company, Inc., a division and wholly owned subsidiary of Litton which continued to operate the typewriter manufacturing business at the same location until approximately July 1967.

5. In approximately July 1967, Litton merged its wholly owned subsidiary, Royal Typewriter Company, Inc., into some other Litton wholly-owned subsidiaries, the sur-

vivor of which became known as Litton Business Systems, Inc. ("LBSI"), a New York corporation.

6. LBSI closed the Royal business at 2401 East Sunshine Street in 1969. GE purchased the Royal McBee building at 2401 East Sunshine in March, 1970.

7. During the period from 1958 through March, 1970, Royal McBee, Royal Typewriter Company, Inc. and LBSI also owned a tract of vacant land immediately north of Sunshine and adjoining the Royal McBee typewriter facility to the immediate west. In March, 1970, LBSI conveyed this tract (Sunshine property) to GE as part of the transaction involving the manufacturing plant.

8. Effective August 1, 1988, Litton merged LBSI into Litton Industrial Automation Systems, Inc. ("LIASI"), a Delaware corporation, and LIASI assumed all of the obligations and liabilities of LBSI.

9. Litton and LIASI currently are both duly authorized and existing corporations under the laws of the State of Delaware.

10. In 1958 Royal McBee purchased land near the intersection of Sunshine and Glenstone streets in Springfield, Missouri for a plant. Royal McBee used its plant to manufacture Royal typewriters.

11. As a byproduct of its manufacturing process, Royal McBee generated cyanide-based electroplating wastes, sludge from the bottom of electroplating tanks and spent plating bath solution.

12. As a part of their duties, Royal McBee employees poured, emptied and dumped the electroplating sludge, tank bottoms and spent plating solution onto the soil surface of the vacant western portion of the Sunshine property during the period 1959–1962 in an area near a "turn-around" at the end of an old construction road on the property.

13. Over time, the metals and cyanide from the wastes dumped by Royal McBee leached and migrated outward and downward from the original dumping location, thus accounting for the larger area ultimately cleaned up.

14. Currently, the vacant western portion of the property containing the site is adjacent to an apartment complex on the west, a housing development on the north, and GE's (formerly Royal McBee's) building on the east. The vacant western portion of the property containing the site fronts on Sunshine Street, a major east/west thoroughfare in Springfield and was one of the last pieces of vacant property on Sunshine between Glenstone Avenue and Highway 65. There is commerce, including retail, manufacturing, restaurant, and housing all around the property. Since the site has been cleaned up, the property has been subdivided and is currently scheduled to be commercial, retail and light industrial property. The gradient of the contaminated area of the site is southwest toward the treeline and apartment complex.

15. The same wastes which were disposed of on the site from 1959–1962 were disposed of by Royal McBee and Litton at the Fulbright landfill in Springfield, Missouri beginning in 1962 when the Fulbright landfill opened (Plaintiff's Exhibit No. 99).

16. There is no evidence that GE dumped any electroplating wastes, or wastes containing the chemicals listed above on the site or the property.

17. In the summer of 1980, when the Missouri Department of Natural Resources ("MDNR") was investigating the defendant's Fulbright dumping activities, GE first learned of Royal McBee's dumping of hazardous wastes on the site. MDNR investigators sought and received GE's permission to interview former Royal McBee workers whom GE then employed. During these interviews at GE's plant, the employees described how they dumped Royal McBee's cyanide-based electroplating solutions and residues on the ground at the Fulbright landfill and on the Sunshine property.

18. In 1981, based on testing done by the MDNR and GE, and the then present technology and health assessments, it was GE's and MDNR's opinion that there was no potential for contamination of the groundwater at the site. In 1984 GE agreed to sell the vacant tract of the prop-

erty including the site (approximately 19 acres) to an investment group which subsequently assigned the property to Enterprise Park.

19. On July 19, 1985, the MDNR proposed registry of the GE site on Missouri's Registry of Abandoned and Uncontrolled Hazardous Waste Sites in Missouri. On August 16, 1985, GE appealed the proposed registry of the site on Missouri's Registry of Abandoned and Uncontrolled Hazardous Waste Sites. Litton was notified of potential CERCLA claims in August, 1985, but did not participate in any of the negotiations.

20. Pursuant to statute, the Missouri Hazardous Waste Commission reviews the status of all sites proposed for the registry which have been appealed. The GE site was discussed at the Hazardous Waste Management Commission meeting on at least three occasions both before and during the course of the clean-up at the site. These Hazardous Waste Management Commission meetings were public meetings of which there was prior published public notice and at which members of the public attended. See plaintiff's Exhibit No. 248.

21. On October 15, 1985, John Crellin, Director of the Bureau of Epidemiology of the Missouri Department of Health ("DOH"), stated that the concentrations of metal in the soil at the Site "represent[ed] a significant health threat and contaminated soil should be removed." Dr. Crellin's health assessment also stated that "current concentrations of chromium, copper, zinc, nickel and arsenic at the General Electric site represent a significant health risk to the public's health.... Cleanup at this site should be concerned with removal of soil to reduce concentrations of these contaminants to below the recommended safe soil level." (Plaintiff's Exhibit No. 1).

22. In October 1985, GE hired OH Materials Company of Findlay, Ohio, an experienced environmental services company, to investigate, assess, monitor and conduct any response actions which were determined to be necessary.

23. On December 20, 1985 the Environmental Protection Agency ("EPA"), found that enforcement action was needed by Missouri for the GE site and that "review of old data revealed that what was considered to be trace amounts in 1981 are now acknowledged as representing a threat to human health and the environment." (Plaintiff's Exhibit No. 220).

24. Throughout the latter part of 1985 and 1986, GE and MDNR engaged in extensive studies of the site and negotiations over its remediation. These discussions culminated in a Consent Decree entered into before the Missouri Hazardous Waste Management Commission which set forth the circumstances and requirements for ongoing remediation of the site. The Decree was executed by GE, by Enterprise Park, by the Missouri Attorney General's office, and by Frederick A. Brunner, Ph.D., the Director of MDNR. In general, the Decree was implemented "to protect the public health and environment from releases or threatened releases of waste materials, if any, from the site through the development, design and implementation of a remedial action plan." (Plaintiff's Exhibit No. 158).

25. The Consent Decree required all remedial action for the site to be "consistent with the National Contingency Plan ["NCP"]." The Consent Decree required MDNR approval of all remedial action.

26. Testing of the soil at the Sunshine property showed that the concentration of metals from three feet deep to the soil surface were considerably above the background levels (i.e. normal soil levels) for the site and many times higher than the safe soil levels determined by the Department of Health. Test results from all of the testing which was performed at the site confirmed that the metals found on the site—copper, chrome, nickel, zinc, lead, and cyanide—were not there from natural causes but were elevated, concentrated and associated with one another, thus indicating that the property was a disposal site, and that the levels of these heavy metals were greater than background levels.

27. GE had OH Materials investigate a range of alternatives for response actions at the site, to insure the response actions

ultimately taken would be consistent with the NCP and Consent Decree.

28. OH Materials produced a Remedial Alternatives Evaluation for the site (hereinafter referred to as the "RATE report") which analyzed several alternative response actions. (Plaintiff's Exhibit No. 5). The costs and benefits of those various alternatives were estimated and outlined in the RATE report of February, 1986. The most expensive remedy was excavation and removal of the soil and disposal of it as a hazardous waste in a hazardous waste landfill. Clay capping was seen to be the next most expensive remedy, followed by excavation and removal as a nonhazardous waste. Fencing and guarding was initially seen as the least expensive remedy; however, guarding at a cost of one hundred thousand dollars a year was seen as necessary given the substantial risk outlined by the DOH and the likelihood that any fence would be breached by children or others from the surrounding apartments or residential areas. Guard service in perpetuity drove the cost of that alternative up over all other proposed remedies.

29. Evaluation of the site by OH Materials and the DOH considered points of exposure, population, environmental and welfare concerns at risk, amount, concentration, hazardous properties, hydrogeological factors, and the extent to which the contamination levels exceeded the State standards.

30. The OHM personnel who performed the remediation of this site, Messrs. Ossi, Haag, Edinger and Stevens, have participated in scores of environmental projects under CERCLA and the NCP, and have expertise in geology, hydrogeology, engineering, and site remediation activities. Their Company has numerous emergency response contracts with various state governments as well as the USEPA. They and their company were well qualified for the remediation work they undertook on behalf of the plaintiff. Each of them testified forthrightly and credibly. Mr. Ossi testified as to the analytical results found at the site, levels which the Court recognizes were well in excess of those permitted by the Department of Health. Mr. Haag testified as to his "ECA analysis," which found by virtue of elevation, concentration, and association of various chemicals that hazardous waste had been placed at the site. The area of contamination identified by Mr. Haag's ECA analysis coincided with the dumping areas described by Messrs. Carroll and McKinnis when Mr. Haag's transparencies were placed on the aerial photographs in evidence. Remediation was necessary within the area defined by Mr. Haag; unnecessary areas were not excavated; and the area of contamination was properly identified.

31. Defendants presented no evidence of any less costly alternatives for remediation of the site which would have met the State clean-up levels.

32. Pursuant to the Missouri Superfund statute and regulations, the MDNR stated that GE could clean up the site to the less stringent of DOH standards or the background levels of metals in the soil.

33. The original remedial levels were established by the MDNR and incorporated into the Work Plan prepared by OH Materials. These levels were: nickel—10 ppm; chromium and lead—50 ppm; copper—20 ppm; cyanide—840 ppm; and zinc—1,000 ppm. Arsenic was established as the higher of 4 ppb or background levels to be later determined and approved by the MDNR.

34. The site was marked into fifty foot grids offsetting by twenty-five feet the old sample locations so that the old sample locations were in the center of each new grid. The soil was excavated from grid to grid and samples were taken after grids were excavated to determine if further excavation was necessary. Excavation began October 13, 1986 and continued until December 7, 1986, when it was terminated pending receipt of analytical results.

35. On the first day of excavation, three 55–gallon drums were discovered buried under the soil surface. On November 19, 1986 an apparent trench was discovered which contained a fourth drum. The fourth drum contained substances which were tested and found to be EP-toxic (characteristically hazardous).

36. The EP-toxic soil and the drums were removed from the site during remediation and were transported to Chemical Waste Management at Emelle, Alabama on or about November 3, 1987 and disposed of in a hazardous waste landfill.

37. As a result of the discovery of the first three drums, the MDNR required the Work Plan to be modified to provide for a metal scan of the remedial area, which was performed December 3, 1986.

38. Based on analytical results obtained from the work done at the site, on February 17, 1987, GE requested from MDNR and DOH a revision of the remedial levels to 150 ppm for lead, 150 ppm for chrome, 20 ppm for arsenic and 20 ppm for nickel, based on revised estimated background levels. The MDNR and DOH subsequently revised and approved clean-up levels of 230 ppm for lead, 230 ppm for chrome and 230 ppm for arsenic based on a revised health assessment by the Department of Health. The MDNR also later revised and approved the remedial level for nickel to 15 ppm.

39. On November 17, 1987 analytical results indicated that all remedial levels were reached in all grids except one which was at bedrock. With the exception of the one grid which was at bedrock, all grids were below the remedial levels required by the Consent Decree with the MDNR and Work Plan.

40. As the most cost effective method that achieved the remedial objectives, GE had recommended disposing of the excavated soil as a nonhazardous waste, or Missouri "special waste," in a sanitary landfill rather than a hazardous waste landfill permitted under the Resource Conservation and Recovery Act ("RCRA"). The MDNR agreed and allowed the waste to be disposed of as a special waste, thus saving a great deal of expense in transportation and disposal charges.

41. The MDNR approved all the response activities of GE both before and after completion of the response actions. MDNR personnel who reviewed, approved and/or were personally present on site during remediation include Suzanne Marcell— On Scene Coordinator, Greg Schoen—Field Technician, Burt McCollough—Super Fund Unit Chief, Keith Schardein—Super Fund Section Chief and Frederick A. Brunner, Ph.D.—Director of the MDNR. On February 8, 1988, after final testing, MDNR Director Frederick A. Brunner, Ph.D. issued an approval of GE's Certificate of Completion of all Site Remediation.

42. Theodore F. Craver, an in-house environmental attorney and vice president for Litton, testified that on behalf of Litton he received written notice of potential CERCLA claims concerning the site on or about August 28, 1985, prior to the incurrence of any response costs by GE. (See also plaintiff's Exhibit No. 134). Mr. Craver also admitted that very shortly thereafter he received a telephone call from GE's in-house counsel concerning potential Litton and GE cooperation in clean-up of the site, also before GE began its investigation or incurred any response costs. Mr. Craver received a subsequent telephone call from GE's in-house counsel in November of 1986, approximately one month after the GE's site remediation had been commenced. Litton, and specifically Mr. Craver, has experience in the environmental area dealing with hazardous waste sites and was substantially involved in the investigation of the Fulbright landfill in Springfield during the entire period of time GE investigated and cleaned up the Sunshine site.

43. GE spent $84,182.39 on the investigation, sampling, analysis and development of the remedial investigation/feasibility ("RI/FS") study which were called in this case the Site Data Report (RI) and the Remedial Alternatives Analysis (FS). This cost also included the development of the Work Plan. These costs represent out of pocket costs to third parties and include no allocation of GE personnel costs and expenses (plaintiff's Exhibit No. 21).

44. The actual cost of the response actions exceeded the original estimate due to several factors, but mostly due to the unexpected presence of buried drums and the fact the nearby landfill which had agreed to take the soil backed out at the last minute due to local publicity. The closest

permitted landfill which would then accept the contaminated soil was in St. Louis.

45. The actual cost of the clean-up, excavation, transportation, disposal of the hazardous soil and the analytical and report preparation for the actual removal was $851,560.84. Additionally, GE incurred $5,100 in telephone and utility fees. These costs represent out of pocket costs to third parties and include no allocation of GE personnel costs and expenses.

46. The response costs charged by OH Materials and paid by GE were the ordinary and reasonable fees charged by OH Materials for the work performed. The total reasonable and necessary response costs on the site which were consistent with the NCP was $940,843.23.

47. General Electric has incurred attorney's fees in both the administrative and litigation phases of this matter.

48. In March of 1987 GE made formal written demand on Litton requesting that Litton indemnify GE for all past and future response costs incurred in cleaning up the site.

## CONCLUSIONS OF LAW

This suit was brought under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.* This Court has jurisdiction over the subject matter and parties and venue is proper. 42 U.S.C. § 9613, 28 U.S.C. § 1331. Any person, who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, shall be liable for any other necessary costs of response incurred by any other person consistent with the national contingency plan, including interest on the amounts recoverable. 42 U.S.C. § 9607. In the instant case, GE's prima facie claim for cost recovery under § 107(a)(4)(B) consists of the following elements:

1. Litton Business Systems, Inc. or Litton Industries, Inc. must fall within one of the four categories of "covered persons."

2. There must have been a release or a threatened release of hazardous substances from the site.

3. The release or threatened release must have caused General Electric Company to incur costs.

4. GE's costs must be necessary costs of response.

5. GE's response actions must be consistent with the national contingency plan.

See *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278–9 (D.Del.1987) *aff'd* 851 F.2d 643 (3rd Cir.1988). Initially, defendant claims that plaintiff's action is barred by the equitable doctrine of unclean hands. Defendant also contends that there was not a release or threatened release of hazardous substances from the site and that any costs incurred were "not necessary" nor "consistent with the national contingency plan." Litton also argues that GE acted as a volunteer and was not liable under CERCLA and therefore GE should not be allowed recovery.

### Unclean Hands Defense

Defendant contends that plaintiff is barred from recovering the costs of the clean-up because subsequent to the discovery of the wastes, GE sold the property without disclosure of the previous dumping. The Court finds that the principle of unclean hands is not applicable to the facts of this case. This is not a suit between GE and a subsequent purchaser; this is a suit between GE (the subsequent innocent purchaser of Litton) and Litton, the party that dumped the materials. It is only when plaintiff's improper conduct is the source or part of the source of his equitable claim that he is to be barred because of the conduct. What is material is not that the plaintiff's hands are dirty but that he dirties them in acquiring the right he now asserts. *Kay v. Vatterott,* 657 S.W.2d 80, 83 (Mo.App.1983). An application of the unclean hands doctrine to the facts in this case would be an injustice.

Furthermore, it is doubtful whether the doctrine is applicable in CERCLA cases. *Smith Land and Import Corporation v.*

*Celotex Corp.*, 851 F.2d 86, 90 (3d Cir. 1988), *cert. denied* — U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989) [quoting *Chemical Waste Management v. Armstrong World Industries,* 669 F.Supp. 1285, 1291 n. 7 (E.D.Pa.1987).] "Unclean hands" is not available as a defense in a suit at law. *Middleton Enterprises, Inc. v. Churm,* 618 F.Supp. 477, 479 (D.C.Mo.1985). The fundamental purpose of CERCLA is to provide for the expeditious and efficacious clean-up of hazardous waste sites. *United States v. Conservation Chemical Company,* 628 F.Supp. 391, 404 (W.D.Mo.1985). Congress intended and anticipated that potential responsible persons would accept and assume the responsibility to effect clean-up. *Id.* One legislative incentive for doing so was availability of a private cause of action under § 107 for response costs. *Id.* In this action, Litton has not been injured nor prejudiced by any actions of GE regarding the subsequent sale of the property. Application of the unclean hands defense in this context would turn congressional intent on its head. *Id.* The Court rejects defendant's contentions regarding the unclean hands defense.

### *Covered Person*

 Defendant contends that GE may not recover because GE was a "volunteer" not a covered person under CERCLA. Defendant misconstrues the statute. It is the defendant who must be a "covered person." A covered person is liable to "any other person." See 42 U.S.C. § 9607. A covered person is any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed. 42 U.S.C. § 9607(a)(2). At the time of the disposal, the site was owned by Royal McBee. The parties provided the following stipulation to the Court:

1. The Royal McBee Corporation ("Royal McBee"), operated a typewriter manufacturing facility at 2401 East Sunshine Street, Springfield, Missouri, between 1959 and 1965.

2. In 1965, pursuant to an agreement of merger, Royal McBee merged with Litton Industries, Inc. ("Litton"), a Delaware corporation, and Litton became the surviving corporation.

3. The Royal Typewriter Company, Inc., a wholly owned subsidiary of Litton, acquired the assets and liabilities of Royal McBee and continued to operate the typewriter manufacturing business at the above-referenced location from the date of the said merger in 1965 to approximately July 1967.

4. In approximately July 1967, Litton merged its wholly owned subsidiary, Royal Typewriter Company, Inc., into some other Litton wholly-owned subsidiaries, the survivor of which became known as Litton Business Systems, Inc. ("LBSI").

5. During the period from 1959 through March, 1970, Royal McBee, Royal Typewriter Company, Inc. or LBSI owned the approximate 19 acre tract of vacant land immediately north of Sunshine and adjoining the Royal McBee typewriter facility to the immediate West. In approximately March, 1970, LBSI conveyed this tract to General Electric Company.

6. The Royal business at 2401 East Sunshine Street was closed by LBSI in 1969.

7. Effective August 1, 1988, Litton merged LBSI into Litton Industrial Automation Systems, Inc., a Delaware corporation ("LIASI").

8. Litton and LIASI currently are both duly authorized and existing corporations under the laws of the State of Delaware.

Plaintiff substituted Litton Industrial Automation System, Inc. as defendant in the current case.

A person is defined as an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity.... 42 U.S.C. § 9601(21). The disposal and the current action occurred between 1958 and 1963. Therefore, LIASI is a person who owned or operated a facility at the time of disposal, and, as such, is the proper defendant in this action.

*Release of Hazardous Substance
From the Site*

"Hazardous substance" means ... (C) any hazardous waste having the characteristics identified under or listed pursuant to § 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921]. 42 U.S.C. § 9601(14). The Solid Waste Disposal Act has been amended, and § 3001 may be found at 42 U.S.C. § 6921 "identification and listing of hazardous waste." Section 6921 provides that the administrator (of the EPA) shall promulgate regulations identifying the characteristics of hazardous waste and listing particular hazardous waste. 42 U.S.C. § 6921(b)(1). A solid waste is a hazardous waste if:

(1) it is not excluded from regulation as a hazardous waste under 261.4(b); and

(2) it meets any of the following criteria:

(i) it exhibits any of the characteristics of hazardous waste identified in subpart (c).

(ii) it is listed in subpart (d) and has not been excluded from the list in subpart (d) under sections 260.20 and 260.-22 of this chapter.

40 C.F.R. § 261.3 (7/1/86 edition).

■ Subpart (c) defines characteristically hazardous substances—those which have the characteristics of ignitability, corrosivity, reactivity and EP toxicity. 40 C.F.R. § 261.20 (7/1/86 edition). Subpart (d) contains lists of hazardous wastes. Except for the fourth drum, at issue in this case are the listed materials in subpart (d). Spent cyanide plating bath solutions from electroplating operations, plating bath residues from the bottom of plating baths from electroplating operations, where cyanides are used in the process, and spent stripping and cleaning bath solutions from electroplating operations, where cyanides are used in the process, are listed hazardous waste from nonspecific sources. 40 C.F.R. § 261.31, F007–F009 (7/1/86 edition). [The Court is using the Code of Federal Regulations which was in effect at the time of the clean-up, however, the Court notes that the current edition of the Code of Federal Regulations contains F007–F009.]

The evidence in this case indicates that cyanide was used in the plating operations of Royal McBee. Two witnesses, Frank Carroll and Harold McKinnis, specifically recall depositing barrels with acid, bleach, cadmium plated sludge, chrome, zinc and cyanide products on the land in question in this suit. The witnesses' personal recollection is confirmed by the extensive testing which was completed by OH Materials on the composition of the land where the dumping occurred. Additionally, the analysis done by the MDNR indicated elevated levels of metals and cyanide. The MDNR indicated that "current concentrations of chromium, copper, zinc, nickel and arsenic at the GE site represent a significant health threat and contaminated soil should be removed." The substance which was dumped on the GE site was a listed hazardous waste pursuant to subpart (d).

■ A "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment. 42 U.S.C. § 9601(22). From 1958 to 1963, defendant dumped 500 gallons per year of waste chemicals on the ground in question. Additionally, as was ascertained at trial, a trench was used to bury a barrel which contained E.P. toxic material. A release of hazardous substances occurred.

■ The site is a "facility" because it is an area where hazardous substances have been deposited or come to be located. A facility is defined at § 101(9) as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed or otherwise come to be located." 42 U.S.C. § 9601(9).

Defendant spent considerable time arguing that the substances are not "hazardous" by today's standards and should not have been considered hazardous in 1985. However, it would be improper for this Court to second-guess the listings propounded by the administrator of the EPA. This Court and the parties to this action were bound by the law as passed by Congress and the regulations as set forth in

the Code of Federal Regulations. There would be no consistency in clean-ups if each court were to assess whether the EPA is correct in its regulations. If parties waited for a court to determine which waste is hazardous, any necessary clean-up would be delayed. In the present case, there would have been no clean-up or use of the present site four years after the MDNR declared "a significant health risk." The opinions of defendant's expert, Dr. Tardiff, are better suited for testimony before Congress or the EPA. For the purposes of this case, the cyanide plating bath solutions, residues, and the drums are defined as hazardous substances under CERCLA.

▪ Defendant faults the plaintiff for not engaging its own toxicologist to dispute the standards as set by the Missouri Department of Natural Resources; however, employment of a toxicologist was not necessary to comply with the National Contingency Plan. As noted above, the standards, which were set by the Missouri Department of Health, and relied upon by the MDNR, and finally acted upon by the plaintiff, cannot now be changed by this Court. In arguing that Missouri standards were followed by the plaintiff and not federal standards, the defendant overlooks the complex scheme of CERCLA which directly provides for state input. MDNR was the state agency which reports to the federal EPA. The EPA also adopted the MDNR recommendation as evidenced in plaintiff's Exhibit 220.

The promulgated Missouri Hazardous Waste Management Law, R.S.Mo. § 260.350 et seq. (referred to as the "Missouri Superfund Statute"), including the provisions dealing with abandoned and uncontrolled sites, R.S.MO. §§ 260.435 through 260.550, and the regulations promulgated thereunder, 10 C.S.R. § 25.10, are laws and regulations which were applicable or relevant and appropriate to the site and were therefore ARARs for the site. Cleanup levels for MDNR approved remedial actions under 10 C.S.R. § 25–10.010(3) are set by the Missouri Department of Health (DOH) pursuant to the statutory delegation

of powers in R.S.Mo. § 260.445.5 which provides that the MDNR "shall utilize the department of health [DOH] when assessing the effects of an abandoned or uncontrolled site on human health." See plaintiff's Exhibit No. 253.

Finally, the Court notes the consent agreement between defendant and the EPA on the Fulbright/Sac River landfill. The credible testimony was that the same wastes were released on the Sunshine site and the Fulbright/Sac site. In particular, the Court finds that Mr. Theodore Craver, Litton's corporate representative in this case, executed an Administrative Order on Consent which contains numerous "Findings of Fact" and "Conclusions of Law" which are relevant herein. In particular, the Administrative Order on Consent, in evidence as plaintiff's Exhibit 254, provides in pertinent part:

5. The Royal McBee business, and its successor business(es), which operated at 2401 E. Sunshine Street in Springfield, Missouri disposed of or caused the disposal of hazardous substances at the Fulbright Landfill between approximately 1962 and 1968 and at the Sac River Landfill. . . .

6. The hazardous substances which were disposed of at the Landfills by the Royal McBee business and/or its successor business(es) included spent acids and plating residues, among others. . . .

*Release or Threatened Release Must Have Caused GE to Incur Costs*

▪ Although there is considerable debate over the necessity and amount of response costs, there does not appear to be a serious debate whether the release or threatened release of the hazardous substance caused GE to incur some costs. "The terms 'respond' or 'response' means remove, removal, remedy and remedial action, all such terms (including the terms 'removal' and 'remedial' action) include enforcement activities related thereto." 42 U.S.C. § 9601(25). Plaintiff is claiming the cost of investigation, planning, monitoring and implementing the response actions as well as costs, attorney's fees and prejudg-

ment interest. It was the intent of Congress that CERCLA be given a broad interpretation so as not to restrict the liability of those responsible parties. *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823, 852 (W.D.Mo.1984). An award of prejudgment interest is not foreign to actions involving environmental statutes. *Id.* (citations omitted). Additionally, CERCLA specifically allows for the recovery of attorney's fees. At trial, defendant argued that GE had not presented a proper claim for attorney's fees. In the amended complaint filed on August 15, 1988, GE prayed for the following relief, "that this Court enter judgment in favor of General Electric and against Litton ... in the amount of the costs of response incurred by General Electric, including interest and attorney's fees." Therefore, attorney's fees and prejudgment interest will be properly recoverable as response costs.

### Response Must Be Necessary and Consistent with NCP

 Defendant's primary contention is that the response costs incurred by General Electric were neither necessary nor consistent with the National Contingency Plan. Section 300.71 provides:

(a)(1) Any person may undertake a response action to reduce or eliminate the release or threat of release of hazardous substances, or pollutants or contaminants. Section 107 of CERCLA authorizes persons to recover certain response costs consistent with this Plan from responsible parties.

(2) For purposes of cost recovery under section 107 of CERCLA, ... a response action will be consistent with the NCP if the person taking the response action:

(i) Where the action is a removal action, acts in circumstances warranting removal and implements removal action consistent with § 300.65.

(ii) Where the action is a remedial action:

(A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;

(B) Complies with the provisions of paragraphs (e) through (i) of § 300.68;

(C) Selects a cost-effective response; and

(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the legally applicable or relevant and appropriate State and local requirements identified under paragraph (a)(4) of this section provides a *substantially equivalent* opportunity for public involvement in the choice of remedy (emphasis added).

\* \* \* \* \* \*

(4) Persons performing response actions that are neither Fund-financed nor pursuant to action under section 106 of CERCLA shall comply with all otherwise legally applicable or relevant and appropriate Federal, State and local requirements, including permit requirements.

Thus, a response action may be consistent with the NCP in either of two ways: as a removal or remedial action. Primarily, Litton argues that GE did not comply with the criteria for a remedial action. Litton argues that GE should have provided for public comment and that the remedy was too broad for the health risks involved. Defendant further argues that had a proper assessment been done, a more cost effective method, such as encapsulating the soil, would have been chosen.

The National Contingency Plan can be found at 40 C.F.R. 300.61 *et seq.* The National Contingency Plan specifically provides that no federal approval of any kind is a prerequisite to a cost recovery under § 107. 50 Fed.Reg. 47934 (Nov. 20, 1985) (preamble to NCP). The NCP is a rule that presents the federal government's general plan or framework for responding to hazardous substances releases. The NCP is not intended to provide complex and detailed site-specific decisionmaking criteria. 50 Fed.Reg. 47920 (Nov. 20, 1985) (preamble to NCP). While some of the subpart is

oriented toward federally funded response actions, the subpart may be used as *guidance* concerning methods and criteria for response actions by other parties under other funding mechanisms. 40 C.F.R. 300.-61(e)(2). Except as provided in § 300.71, nothing in this part limits the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA § 107. *Id.*

The Court finds that GE's action was consistent with the NCP as a removal action. Section 300.64 provides:

(a) A preliminary assessment of a release or threat of a release identified for possible CERCLA response pursuant to § 300.65 shall, as appropriate, be undertaken by the lead agency as promptly as possible. The lead agency shall, as appropriate, base the assessment on readily available information. This assessment may include but is not limited to:

(1) Identification of the source and nature of the release or threat of release;

(2) Evaluation by HHS or by other sources (e.g., State public health agencies) of the threat to public health;

(3) Evaluation of the magnitude of the potential threat;

(4) Evaluation of factors necessary to make the determination of whether a removal is necessary; and

(5) Determination if a non-Federal party is undertaking proper response.

\* \* \* \* \* \*

(c) A preliminary assessment shall be terminated when the OSC or lead agency determines:

(1) There is no release or threat of release;

(2) The source is neither a vessel nor a facility;

(3) The release does not involve a hazardous substance, nor a pollutant or contaminant;

(4) The amount, quantity, and concentration released does not warrant Federal response;

(5) A party responsible for the release, or any other person, is providing appropriate response, and on-scene monitoring by the government is not required; or

(6) The assessment is completed.

In this action it is clear that the state public health agencies responsible for the evaluation of the threat to public health (the MDNR and DOH) concluded that the concentrations of chromium, copper, zinc, nickel and arsenic at the General Electric site represented a significant health risk to the public's health. (Plaintiff's Exhibit 1). As the "lead agency", the MDNR also ascertained that health effects may occur as a result of exposure through ingestion of contaminated soils.

Defendant strenuously argues that the Missouri Department of Health assessment (Dr. Crellin's report) was an inaccurate assessment of the health risk. As noted above, those arguments are better addressed to the legislature, the Missouri Department of Natural Resources or the Missouri Department of Health. Section 300.-65 provides that the lead agency shall first review the preliminary assessment and then have the responsible parties perform the necessary removal actions. DOH provided the preliminary assessment, MDNR reviewed the assessment and GE performed the removal.

The regulations further provide:

(b)(1) At any release, regardless of whether the site is included on the National Priorities List, where the lead agency determines that there is a threat to public health or welfare or the environment, based on the factors in paragraph (b)(2) of this section, the lead agency may take any appropriate action to abate, minimize, stabilize, mitigate, or eliminate the release or threat of release, or the threat resulting from that release or threat of release.

(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this subsection:

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release [not applicable to private party responses];

(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

40 C.F.R. 300.65.

Again, as noted above, in this action the lead agency determined that there was a threat to the public health or welfare based upon the actual or potential exposure to hazardous substances primarily due to the high levels of hazardous substances or pollutants in soils at or near the surface. The agency determined that the "appropriate action" was to eliminate the release or threat of release. The Missouri Department of Natural Resources noted that with unrestricted land use a potential for future exposure does exist at that site and the "[c]lean-up at this site should be concerned with removal of soil to reduce concentrations of these contaminants to below the recommended safe soil level." It is clear to this Court that plaintiff implemented the removal action consistent with § 300.65.

Next, defendant contends that plaintiff failed to comply with the remedial action provision of the NCP by not holding public hearings. Public hearings are not mandated in the NCP when compliance with legally applicable or relevant and appropriate state requirements provides a substantially equivalent opportunity for public involvement. The property in question was being developed for unrestricted land use. A consent decree was entered between MDNR and plaintiff. The MDNR monitored the appropriateness of the action throughout the clean-up. Additionally, the EPA found that enforcement action was needed by Missouri for the GE site and that "[R]eview of old data revealed that what was considered to be trace amounts in 1981 are now acknowledged as representing a threat to human health and environment."

It is clear to the Court that no public hearing was required due to the fact that GE was complying with legally applicable or relevant and appropriate state requirements that the waste be removed. Furthermore, if notice to the public is a requirement, the input of the Missouri Department of Natural Resources serves as a substitute for public comment. Defendant was specifically notified that a clean-up was necessary and that defendant was considered a responsible party. Statutes such as CERCLA which were enacted for the protection and preservation of public health are to be given an extremely liberal construction for the accomplishment of their beneficial objectives. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986). "Courts will not interpret section 9607(a) in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intent otherwise." *United States v. Aceto Agricultural Chemical Corp., et al,* 872 F.2d 1373 (8th Cir.1989) (quoting *Dedham* ).

Furthermore, plaintiff complied with § 300.71(1)(2)(i) by providing an appropriate site investigation and analysis of remedial alternatives as required under 300.68 when they hired OH Materials to do their site investigation. Defendant's claim that the site investigation done by OH Materials was not consistent with 300.65 has no merit. The regulations provide that a remedial investigation/feasible study (RI/FS) shall be undertaken by the lead agency to determine the nature and extent of the threat presented by the release and evaluate proposed remedies. 40 C.F.R. § 300.68(d). That study is to include sampling, monitor-

ing and exposure assessment. OH Materials provided an extensive sampling of the soil contained at the site. (See plaintiff's Exhibits 3, 4 and 5). The regulations specifically provide that during the remedial investigation, the original scoping of the project may be modified based upon the factors in § 300.68(e). Modifications were made during the remediation.

Section 300.68(e) provides that the lead agency, in cooperation with the states, will examine available information and determine the type of response that may be needed to remedy the release based upon the factors in Paragraph (e)(2) of § 300.68. Subsection (e)(2) provides that the factors should be considered *as appropriate*. Defendant argued that several of the factors were not considered by the plaintiff in the scoping of response actions. For instance, defendant claims that the plaintiff did not consider the climate. The Court finds that the plaintiff considered all of the appropriate factors as evidenced by plaintiff's Exhibits 1 and 3 through 11. Furthermore, as evidenced in the preamble to the National Contingency Plan, the NCP "is a rule that presents the federal government's general plan or framework for responding to hazardous substance releases. The NCP is not intended to provide complex and detailed site-specific decisionmaking criteria. EPA has developed guidance on the feasibility study process and is developing additional addenda to that guidance to more fully detail the information to be considered in decision-making." 50 Fed.Reg. (Nov. 20, 1985) (preamble to NCP) (p. 43 Westlaw). EPA intends that the decisionmaking process to be used at each site to determine applicable or relevant and appropriate requirements should be, insofar as possible, straightforward enough to lead private parties to select remedies that protect public health and the environment. *Id.* at 43–44.

Consistency with the National Contingency Plan does not necessitate strict compliance with its provisions. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898–99 (9th Cir.1986). Congress intended and anticipated that potentially responsible persons would accept and assume the responsibility to effect clean-up. *Conservation Chemi-*

*cal Company,* 628 F.Supp. at 405. Neither EPA approval nor national priorities listings are prerequisites for private recovery of response costs which are otherwise consistent with the NCP. *Conservation Chemical Co.* at 405. Because one of the major purposes of CERCLA is *"to induce such persons voluntarily* to pursue appropriate environmental response actions with respect to inactive hazardous waste sites," a private party need not await a government mandate or governmental approval to respond to a hazardous waste site. *United States v. Newcastle County,* 642 F.Supp. 1258, 1264 (D.Del.1986) (emphasis in original) (quoting H.R.Rep. 1016, 96th Cong., 2d Sess. 17, reprinted in 1980 U.S.Code Cong. Ad.News 6119, 6120).

In response to contaminated soil or waste—actions to remove, treat, or contain the soil or waste to reduce or eliminate the potential for hazardous substances or pollutants or contaminants to contaminate other media (ground water, surface water, or air) and to reduce or eliminate the potential for such substances to be inhaled, absorbed or ingested are considered appropriate actions. 40 C.F.R. § 300.68(j)(3). An alternative that far exceeds the cost of other alternatives evaluated and that does not provide substantially greater public health or environmental protection or technical reliability shall usually be excluded from further consideration. However, an alternative that meets or exceeds applicable or relevant and appropriate federal public health and environmental requirements provides substantially greater protection than do alternatives that do not meet such requirements. 40 C.F.R. § 300.68(g)(1). The analysis done by OH Materials showed that at the time the decision to remove the contaminants was made, not only was removal the most cost effective, it was mandated by the state standard. As noted above, under § 300.71 plaintiff was obligated to comply with all otherwise legally applicable or relevant and appropriate federal, state and local requirements. EPA's policy statement was that compliance with applicable or relevant and appropriate requirements is necessary to provide ade-

quate protection of human health and the environment. 50 Fed.Reg. 47916 (Nov. 20, 1985) (preamble to NCP). Any remedial action lesser than clean-up to background or DOH standards by removing the soil would not have been consistent with the NCP. "[T]he fact that [GE] sought and obtained the approval of DNR before beginning the clean-up and bringing this action indicates that [GE's] costs were consistent with the national contingency plan." *Anheuser–Busch v. Chas. Todd Corp.*, No. 85–236C(A) slip op. at 10 (E.D.Mo. November 4, 1987).

The credible evidence presented at trial convinces the Court that plaintiff engaged in a proper assessment of the potential hazard and evaluation of the alternative modes of remediation. Plaintiff then selected the remedy that was the most cost effective in the long run. In making that decision, GE certainly considered that the land was to be used for development of an industrial park and that the contaminated area was thought to be relatively minor. GE was not aware that a trench had been dug and barrels had been buried on the site, necessitating an even greater clean-up. GE was realistic in its assessment that a clay cap would have been a temporary solution making the land unusable as an industrial park. Defendant had every opportunity to participate in the clean-up but failed to do so. Therefore, the Court finds that the plaintiff met its burden in showing that the defendant is a covered person, that a release of hazardous substance from the site occurred, that that release or threatened release caused plaintiff to incur costs, that those costs were necessary costs of the response and that the response actions were consistent with the NCP.

The NCP lists remedial actions which generally are appropriate for a given type of site. Furthermore, equity and the law dictate that the party responsible for the contamination be liable. The defendant, therefore, will be held liable for the clean-up on the "Sunshine" property.

### Cost Analysis

Plaintiff presented documentation which indicates costs incurred by the plaintiff for the assessment and clean-up in the amount of $940,843.23. (Plaintiff spent $84,182.39 on the initial assessment, $5,100 on utility costs and $851,560.84 for the clean-up.) Under CERCLA prejudgment interest accrues "from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a). The plaintiff made written demand for its previously incurred response costs, excluding attorney's fees and court costs, at the initiation of its action against defendant, which was on June 19, 1987. All additional response costs, excluding attorney's fees and court costs, were incurred by September 9, 1988. Accordingly, these are the dates when interest commenced accruing.

Plaintiff submitted and defendant has not challenged the appropriate prejudgment interest. The Court accepts the calculations provided in Appendix A of plaintiff's post-trial brief for the appropriate interest rate. The total amount of interest is $134,788.87. The total amount of response costs, excluding attorney's fees and court costs, with prejudgment interest to June 20, 1989 is $1,075,632.10.

Defendant argues the collateral benefit rule applies to this case. Assuming however that the "Collateral Benefit Rule" is a legally cognizable rule with potential application to GE, the Court finds its application to be factually unsupported. The apparent linchpin of Litton's "collateral benefit" argument is Litton's contention that GE knew at the time it purchased the subject property that it was acquiring industrial property with a dump prominently located thereon. The trial evidence failed to support this. There is no evidence in the record that the property was being used as a dump at the time GE purchased the property in 1970. Moreover, Litton's dumping took place in a grassy field behind the row of trees which ran east and west across the property. There is no evidence that such dumping activities could have been viewed due to the high grasses, the location of the tree line, and the fact that the area of the dump was not visible from most points

around the plant due to the tree line and grasses.

On June 6, 1989, defendant filed a document entitled "Constitutional Objections To the Issues Raised By Plaintiff." Defendant filed no suggestions in favor of the motion nor support at trial for the motion. The motion will be denied.

Accordingly, for the reasons set forth above, it is hereby

ORDERED that plaintiff shall within thirty (30) days from the entry of this order submit an itemization of the attorney's fees and costs incurred by plaintiff after June 19, 1987 at which time defendant shall be granted twenty (20) days to respond to plaintiff's itemization of costs incurred; and it is further

ORDERED that upon a determination of the amounts of attorney's fees and costs to which plaintiff is entitled to recover, judgment will be entered in favor of plaintiff and against defendant; and it is further

ORDERED that defendant's constitutional objections are denied for failure to comply with Local Rule 13(B).