AMERICAN COLOR & CHEMICAL
CORPORATION, Plaintiff,

v.

TENNECO POLYMERS,
INC., Defendant.

Civil Action No. C/A 3:90–2741–0.

United States District Court,
D. South Carolina,
Columbia Division.

April 21, 1995.

finds in favor of American Color on its CERCLA claim, and specifically adopts the finding of the advisory jury as to liability and as rendered by answer to the special interrogatory. *See* Federal Rules of Civil Procedure (F.R.C.P.), Rule 39(a); Moore's Federal Practice § 39.10.

Robert Erving Stepp, Elizabeth Gelene Howard, Glenn, Irvin, Murphy, Gray & Stepp, Columbia, SC, for Plaintiff.

Michael S. Thwaites, Edward Grantland Burns, Phillip Arthur Kilgore, Phillip Lee Conner, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PERRY, District Judge.

This matter is before the court on Plaintiff American Color and Chemical Corporation's ("American Color") claim arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 to 9657. Specifically, American Color seeks recovery under CERCLA § 107, 42 U.S.C. § 9607, for past and future response costs incurred in remediating PCB contamination from its former plant site in Lobeco, Beaufort County, South Carolina.

American Color's CERCLA § 107 claim was joined with a number of state law claims[1] and a contract counterclaim asserted by Defendant Tenneco Polymers, Inc. ("Tenneco"), all of which were tried to a jury from November 3–19, 1993. American Color requested, and Tenneco consented to, an advisory jury with respect to the CERCLA claim. The jury found for Tenneco as to American Color's state law claims, for Tenneco on its contract counterclaim, and for American Color on the CERCLA claim. In connection with its finding that American Color should prevail under CERCLA, the jury responded affirmatively to a special interrogatory relating to the CERCLA claim. For the reasons set forth below, this Court

### FINDINGS OF FACT

After receiving the testimony, carefully considering all the evidence, weighing the credibility of all of the witnesses, reviewing both parties' briefs and exhibits, considering the advisory verdict rendered by the jury, and studying the applicable law, this Court makes the following Findings of Fact and Conclusions of Law pursuant to F.R.C.P. Rule 52. The Court's Findings of Fact are limited to the CERCLA claim as the jury was the trier of fact with respect to American Color's state law claims and Tenneco's contract counterclaim. To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

1. This action involves real property located in Lobeco, Beaufort County, South Carolina (the "Site").

2. The Site was initially owned by Tenneco Chemicals, Inc. ("Tenneco Chemicals"). The Tenneco Chemicals Berkshire Color Division constructed a plant ("the Lobeco plant") for the production of dyestuff intermediates in 1967. Prior to that time, the property was farmland and had not been subjected to any industrial or commercial use.

3. Tenneco Chemicals operated the plant as part of its Berkshire Colors Division (the "Colors Department") from 1967 to 1974. Plaintiff's Trial Exhibit 22.

4. Tenneco Chemicals changed its name to Tenneco Resins, Inc. and was subsequently dissolved in December, 1982. Defendant's Trial Exhibit 46.

---

**1.** American Color alleged the following causes of action: fraud, constructive fraud, gross negligence, contribution or indemnification and unjust enrichment.

5. Tenneco acquired certain assets, rights and liabilities from Tenneco Chemicals. *Id.*

6. Tenneco admitted that it used a Monsanto Corporation PCB-containing product, Aroclor 1248, in its operation of the Lobeco plant. Amended Answer and Counterclaim at ¶ 21.

7. Tenneco admitted that its activities resulted in the discharge of PCBs into a waste lagoon. *Id.* at ¶ 22 and 23.

8. Tenneco admitted that the Lobeco plant site is a "facility" as defined pursuant to 42 U.S.C. § 9601(9). Amended Answer and Counterclaim at ¶ 26.

9. Tenneco admitted that it was the former owner and operator of the Lobeco facility. *Id.* at ¶ 27.

10. Tenneco admitted that some of its activities resulted in a release of hazardous substances as defined under CERCLA. *Id.* at ¶ 29.

11. More specifically, during its operation of the Lobeco plant, Tenneco used a PCB-containing heat transfer oil in the production of J–Acid, a dyestuff intermediate produced at the Lobeco plant. One step in the production of J–Acid required that the raw materials be interacted at very high temperatures. Testimony of Lew Palombo, Vol. VII, p. 21. The high temperatures were attained by the use of a heat transfer oil in a hot oil reactor system. *Id.* at 21–22. Aroclor 1248, a Monsanto product containing PCBs, was used by Tenneco in that system.

12. The hot oil system in which the Aroclor 1248 was used by Tenneco malfunctioned at times. On these occasions the heating elements would "blow out", resulting in discharges of PCBs into the Lobeco drainage system. Testimony of Pete Winchester, Vol. II, p. 40–41. The quantity of the PCB discharges varied, but ranged from a few gallons to 300 gallons, the entire capacity of the system. Testimony of John Meeks, Vol. I, p. 60.

13. In order to replace blown out elements, the entire hot oil system had to be drained. Winchester Testimony, Vol. II, p. 41. When the Aroclor 1248 was drained by Tenneco, it sometimes leaked into the drain-age system or onto the ground. The Aroclor was added back to the system after the element was replaced. Meeks Testimony, Vol. I, p. 60.

14. The Aroclor 1248 that leaked or spilled from the hot oil system fell to the ground or into drainage pipes that lead to a holding lagoon. Meeks Testimony, Vol. I, p. 60. Untreated liquids from the lagoon were discharged directly into Whale Branch, which flows into Campbell Creek, and ultimately reaches the Atlantic Ocean. Meeks Testimony, Vol. I, p. 63.

15. Commencing in 1970, Monsanto began advising its heat transfer oil customers, including Tenneco, of potential environmental hazards associated with PCBs. Plaintiff's Trial Exhibit 70. In December 1971, Monsanto stopped the manufacture and sale of Aroclor 1248 and instituted a recall. Plaintiff's Trial Exhibit 78. Monsanto informed Tenneco of the recall on numerous occasions. Plaintiff's Trial Exhibits 78, 79, 80, 81, 86, 89.

16. Tenneco's hot oil system at Lobeco was modified in July, 1972. Plaintiff's Trial Exhibit 82. New heating elements were put into service at that time and the design of the system was modified so that blow outs were less frequent. The oil was changed from Aroclor 1248 to a non-PCB oil, Humbletherm. Palombo Testimony, Vol. VII, p. 34.

17. Neither American Color or any subsequent owner/operator of the Lobeco plant used any PCB-containing products at the site. Tenneco was the only entity to employ such products at the Lobeco plant.

18. During the time Tenneco operated the Lobeco plant it utilized an isolated "burn" site on the outer reaches of its Lobeco property for the burial of used drums, off-spec material, paper and metal refuse and the like. Meeks Testimony, Vol. I, p. 57; Winchester Testimony, Vol. II, p. 37. Aroclor 1248 was released into the burn site area during Tenneco's ownership of the plant. Winchester Testimony, Vol. II p. 46–47.

19. American Color never used the burn site for any purpose during its ownership and operation of the Lobeco plant, nor did any subsequent owner. Tenneco was the only

entity to utilize the burn area. Meeks Testimony, Vol. I, p. 57.

20. In 1973, Tenneco Chemicals decided to sell the Colors Department, including the Lobeco plant. Testimony of Mark Minkus, Vol. VIII, p. 37.

21. American Color purchased the assets of the Colors Department from Tenneco Chemicals pursuant to an asset purchase agreement dated December 20, 1973, ("1973 Agreement") which by its terms transferred ownership of the purchased assets effective January 2, 1974. The assets purchased included the Lobeco plant. Plaintiff's Trial Exhibit 25.

22. Tenneco has, by agreement, acquired all interests and rights from Tenneco Chemicals pertaining to the sale of the Lobeco plant to American Color. Defendant's Trial Exhibit 46.

23. At the time of American Color's purchase of Tenneco Chemicals' Colors Department assets, Tenneco did not disclose to American Color, nor did American Color otherwise know, that Tenneco had used PCBs at the Lobeco plant. American Color did not know that PCBs had been released into the environment at various locations at the Lobeco plant. Testimony of Frank Hopkins, Vol. III, p. 92, 99. American Color had no reason to suspect that Tenneco would have used PCB-containing oils, as American Color never used PCB-containing oils at its plants that produced products similar to those produced at Tenneco's Lobeco facility. Testimony of Primo Marchesi, Vol. IV, p. 127.

24. Lewis Palombo was the plant manager at Lobeco at the time of the asset sale in December, 1973. Palombo knew, prior to December 1973, that PCBs had been released at the plant. Palombo Testimony, Vol. VII, p. 56–57.

25. PCBs are hazardous substances as defined in CERCLA.

26. American Color owned and operated the plant from January 2, 1974, until October 1, 1982. Meeks Testimony, Vol. I, p. 68, 71. In October 1982, American Color sold the Lobeco plant to Venture Chemicals, Inc. Meeks Testimony, Vol. I, p. 71. (Venture Chemicals subsequently changed its name to Lobeco Products, Inc. and is referred to hereinafter as "Lobeco Products"). Lobeco Products continues to own and operate the plant today. Meeks Testimony, Vol. I, p. 72. The plant still manufactures chemicals and intermediates used in the dyestuffs industry. Meeks Testimony, Vol. I, p. 55.

27. Throughout its existence, the manufacturing process utilized by the various owners at the plant has produced an effluent, which is regulated by the South Carolina Department of Health and Environmental Control ("DHEC"). Regulation of the effluent as well as other environmental matters affecting the Lobeco plant site, falls within DHEC's pollution control function.

28. In 1975, American Color was required to obtain a National Pollution Discharge Elimination System ("NPDES") permit for its plant effluent as a result of the enactment of the federal Clean Water Act.

29. In 1985 Lobeco Products was required to do testing in connection with the renewal of its NPDES permit. Meeks Testimony, Vol. I, p. 78.

30. DHEC conducted an in-stream assessment of Campbell Creek and Whale Branch in 1983. Testimony of Russ Sherer, Vol. III, p. 5–6.

31. A follow-up DHEC study in December 1984 revealed the presence of PCBs in the immediate vicinity of the Lobeco plant effluent discharge point. Plaintiff's Trial Exhibit 11 (DHEC Report).

32. As part of DHEC's investigation into the potential source of the PCBs it found in Campbell Creek, groundwater testing was conducted at the Lobeco plant by Davis & Floyd Engineering. Meeks Testimony, Vol. I, p. 80. The initial groundwater monitoring report revealed the presence of PCBs at the Lobeco plant, which report was publicized in a DHEC press release issued on November 1, 1984. Plaintiff's Trial Exhibit 160. John Meeks, the plant manager for Lobeco Products, did not initially know why PCBs were being found at the plant. Meeks Testimony, Vol. I, p. 85.

33. Based upon the initial discovery of PCBs through groundwater testing, Lobeco

Products commissioned further tests in order to characterize the extent and location of the PCB problem at the Lobeco plant. Initial soil borings indicated the presence of PCBs in the abandoned lagoon. Meeks Testimony, Vol. I, p. 85–86.

34. Subsequent to the DHEC-initiated discovery of PCBs on the Lobeco site, PCB use at the plant was traced to Tenneco by John Meeks when he and his staff found old Tenneco purchase orders for Aroclor 1248 and correspondence to Tenneco from Monsanto regarding potential environmental hazards associated with PCBs and Monsanto's Aroclor recall program. Meeks Testimony, Vol. I, p. 87–91.

35. Meeks did not find evidence at the plant that Tenneco's Lobeco plant had sent the Aroclor 1248 back to Monsanto as Monsanto had requested. Meeks Testimony, Vol. I, p. 87–92. At Meeks' request in 1986 Monsanto searched for documents relating to the return of Aroclor by Lobeco. Monsanto did not have a record of Lobeco having returned material to Monsanto for proper disposal. Plaintiff's Trial Exhibit 175. Nor could Monsanto find any such evidence when it was asked to produce documents in its possession relating to Aroclor 1248 and Tenneco's Lobeco plant as part of discovery in this case. Deposition Testimony of Thomas Bistline, p. 7.

36. Lobeco Products reported its findings regarding the PCB contamination to American Color and Tenneco, as well as to DHEC. Meeks Testimony, Vol. II, p. 103, 110.

37. DHEC was closely involved in Lobeco Products' preliminary investigation of the PCB contamination. DHEC agreed to the hiring of G & E Engineering ("G & E") and met with G & E representatives prior to their going on site. Plaintiff's Trial Exhibit 169. G & E thereafter submitted a proposal to DHEC regarding investigation of the contamination. Various elements of G & E's work were reviewed and approved by DHEC. *See* Plaintiff's Trial Exhibits 177, 180 and 181.

38. G & E issued its preliminary investigation report in April 1986. The G & E report more precisely pinpointed the location of the PCB contamination at the abandoned lagoon and former Tenneco burn site areas. The G & E report identified the source of the PCBs as being Tenneco's use of Aroclor 1248 at the Lobeco plant. Plaintiff's Trial Exhibit 1.

39. Neither American Color nor Lobeco Products used PCBs in the operation of the plant. Testimony of Roger Towe, Vol. VI, p. 111.

40. DHEC received and reviewed the G & E April 1986 report. Sherer Testimony, Vol. III, p. 13.

41. Subsequent to its review of G & E's report, DHEC officials summoned representatives of Lobeco Products, American Color and Tenneco for a meeting to discuss necessary action at the Lobeco plant site. DHEC demanded that Lobeco Products, American Color and Tenneco remediate the PCBs from the site. Sherer Testimony, Vol. III, p. 17. If Lobeco Products, American Color and Tenneco had not agreed to remediate the PCBs from the site, DHEC was prepared to bring an enforcement action against them. Sherer Testimony, Vol. III, p. 53.

42. PCBs were the contaminant of concern and drove the remediation of the Lobeco site. Meeks Testimony, Vol. II, p. 26; Sherer Testimony, Vol. III, p. 14; Testimony of Norman Parker, Vol. IV, p. 123. The remediation of the PCBs incidentally removed other contaminants present in lesser amounts in Lobeco soils, which contaminants were of no immediate concern to DHEC. Sherer Testimony, Vol. III, pp. 49–50.

43. The cleanup of the PCB contamination took place under three DHEC Consent Orders. Plaintiff's Trial Exhibits 22, 23, and 24. DHEC participated heavily in drafting and negotiating all three Consent Orders. Sherer Testimony, Vol. III, p. 16. Indeed, DHEC was substantially and actively involved in all aspects of the remediation. *See generally* Sherer Testimony and Plaintiff's Trial Exhibits introduced therein; Meeks Testimony, Vol. I, p. 103–104.

44. The first Consent Order was dated June 1, 1987. Pursuant thereto, American Color and Tenneco were required to submit a Plan of Study to DHEC "which addresses

the action(s) to be taken to determine the full extent and degree of contamination at the Lobeco site." Plaintiff's Trial Exhibit 22. Upon approval of the Plan of Study the parties were required to "carry out the approved plan in accordance with the approved schedule." *Id.* Lobeco Products was not required to take any action pursuant to the first Consent Order.

45. In a separate agreement dated November 30, 1987, Tenneco and American Color agreed to forego any claims each of them may have had against the other pending the conclusion of the DHEC-required PCB cleanup (the "Waiver and Agreement"). Pursuant to the Waiver and Agreement, American Color and Tenneco deferred litigation of claims against each other relating to the PCB contamination and agreed that neither party could raise the statute of limitations as a defense to any action thereafter brought concerning claims covered by the Waiver. Plaintiff's Trial Exhibit 21.

46. American Color and Tenneco also agreed in June 1987, to share equally the costs associated with the PCB cleanup at the Lobeco plant site. Plaintiff's Trial Exhibit 201. This agreement was honored by Tenneco until March, 1991.

47. Tenneco suggested, and American Color agreed, that Sam Lane of Lane Environmental Services should serve as the consultant for the PCB cleanup and for the drafting of the required Plan of Study. Marchesi Testimony, Vol. IV, p. 128. Lane had previously been retained by Tenneco. *Id.* at 136–137. Lane has since acted as the Project Manager for the entire PCB remediation project.

48. DHEC was extensively involved in the creation of the Plan of Study. DHEC reviewed draft versions of the Plan of Study. Plaintiff's Trial Exhibits 197 and 202. DHEC commented upon the draft plans. Plaintiff's Trial Exhibits 203, 204, 207, 209 and 210. DHEC held meetings regarding the draft plans. Plaintiff's Trial Exhibits 204, 205. *See also* Sherer Testimony, Vol. III, p. 19. DHEC's comments were incorporated into the Plan of Study. Plaintiff's Trial Exhibit 208. DHEC approved the Plan of Study in November, 1987. Plaintiff's Trial Exhibits 211, 212, 213, and 216.

49. More than 37 different DHEC staff persons and 14 DHEC divisions were involved with the Lobeco plant site investigation and remediation. See Plaintiff's Trial Exhibits introduced during Sherer's Testimony.

50. DHEC was involved in the continuing assessment of the PCB contamination. Plaintiff's Trial Exhibits 218, 222, 223, 225, 228, 229, 236 and 239. DHEC approved monitoring wells and sampling groundwater procedures, reviewed the Historical Operational Survey Report, approved the maintenance of certain temporary wells and received a summary of groundwater measurements. *Id.*

51. DHEC was also heavily involved in the preparation of a remedial action plan and the selection of the remedial alternative for the PCB contaminated soils located at the Lobeco plant site. Through a competitive process, RMT, Inc. of Greenville, South Carolina was chosen as contractor for the remediation. RMT and Lane prepared a site assessment which included a discussion of available remedial alternatives, entitled the Lobeco Site Environmental Assessment Results, and proposed Remedial Action Plan (the "Remedial Action Plan"). Plaintiff's Trial Exhibit 5. DHEC received the Remedial Action Plan submitted by RMT in September 1988. Plaintiff's Trial Exhibit 237. DHEC commented upon this Remedial Action Plan. Plaintiff's Trial Exhibit 243. DHEC also held meetings thereon. Plaintiff's Trial Exhibits 244, 245, 246, 247, 250, 255 and 257. DHEC approved the Remedial Action Plan, as revised, in February 1989. Plaintiff's Trial Exhibit 248.

52. In its Remedial Action Plan, RMT considered four alternatives for the remediation: installation of a Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 through 6987, ("RCRA") vault (which would have entombed the contaminated soil on site); excavation and on-site incineration of the contaminated soil; excavation and off-site incineration of the contaminated soil ("dig and haul"); and bioremediation. The dig and haul alternative was selected by DHEC,

the parties and the public despite the fact that it was the most expensive of the four alternatives considered. Towe Testimony, Vol. VI, p. 142–143; Deposition Testimony of Sam Lane p. 95, l. 21—p. 96, l. 2; p. 84, l. 15—p. 86, l. 13; Plaintiff's Trial Exhibit 256.

53. Once the DHEC-approved dig and haul remediation began, Lane submitted Progress Reports to DHEC. *See* Plaintiff's Trial Exhibits 219, 220, 224, 226, 232, 288, 294 and 295.

54. DHEC required and received Health and Safety Plans. Plaintiff's Trial Exhibits 221 and 282.

55. DHEC certified Savannah Laboratories to provide analytical services required during the approved remediation. *See* Exhibits 269 and 270.

56. A Project Manual for the remediation was submitted to DHEC. Plaintiff's Trial Exhibits 3, 271, 272 and 278.

57. DHEC reviewed other cleanup activities, specifically the design details of the portable water treatment system that one of the contractors was to use to treat the groundwater, and the method of discharge of treated water during the remediation. Plaintiff's Trial Exhibits 283 and 284.

58. DHEC conducted an inspection upon completion of the dig and haul remediation of the PCB-contaminated soils. Sherer Testimony, Vol. III, p. 28.

59. DHEC received the draft final report regarding the dig and haul from Lane in February 1991. Plaintiff's Trial Exhibits 2 and 297. DHEC commented upon this Final Report, Plaintiff's Trial Exhibit 302, which comments were incorporated into the final version of the report.

60. The Final Report and completion of the dig and haul portion of the remediation was approved by DHEC on November 5, 1991. Plaintiff's Trial Exhibits 303 and 309.

61. The first Consent Order was amended on October 11, 1989. Exhibit 23. DHEC participated fully in the negotiation of the Amended Consent Order. Sherer Testimony, Vol. II, p. 16.

62. The Amended Consent Order addressed discharge of treated groundwater ac-cumulated during the PCB remediation. *Id.* During negotiations on the Amended Consent Order, Tenneco proposed, and the parties, including DHEC, agreed to delete any reference to the National Contingency Plan (NCP). Towe Testimony, Vol. VI, p. 68–72. The parties did not make any affirmative decision regarding whether or not they would comply with the NCP in remediating the Lobeco plant site.

63. At least eight governmental bodies or agencies other than DHEC also participated, to some degree, in the Lobeco plant site investigation and cleanup: 1) South Carolina Wildlife and Marine Resources Department; 2) Beaufort County Council; 3) South Carolina Coastal Council; 4) South Carolina Water Resource Commission; 5) U.S. Environmental Protection Agency; 6) U.S. Army Corps of Engineers; 7) the Food and Drug Administration; and 8) U.S. Department of the Interior, Fish and Wildlife Service. A summary of the involvement of each follows:

64. In September, 1985, the South Carolina Wildlife and Marine Resources Department found elevated levels of PCBs in sediment oysters and crabs in Campbell Creek, with the highest levels near the Lobeco plant's effluent discharge point. Plaintiff's Trial Exhibit 146. The South Carolina Wildlife and Marine Resources Department continued to be involved from time to time after completion of its studies, as is evidenced by correspondence from its executive director to the Beaufort County Council dated February 21, 1985, and by other correspondence. Plaintiff's Trial Exhibits 143, 144, 155.

65. The U.S. Fish and Wildlife Service reviewed documents regarding the plant's effluent in connection with the NPDES permit renewal. Plaintiff's Trial Exhibits 130, 149. The Federal Food and Drug Administration ("FDA") tested oyster meat in connection with the instream assessment. Plaintiff's Trial Exhibit 132. Other agencies commented on the 1983 NPDES renewal. Plaintiff's Trial Exhibits 129, 130, 131 and 132.

66. After the PCB contamination was initially discovered by DHEC, the Beaufort County Council and other interested groups became involved in the investigation of the

PCB contamination. Meeks Testimony, Vol. II, p. 25. Beaufort County Council held two meetings with DHEC relating to PCB contamination. Sherer Testimony, Vol. III, p. 33; Plaintiff's Trial Exhibit 128. On November 26, 1984, Beaufort County Council met in its chambers along with officials from the Sierra Club, Venture and other interested citizens to discuss the PCB contamination and its source. *See* Meeks Testimony, Vol. II, p. 25.

67. On January 23, 1985, DHEC sponsored a meeting at the South Carolina Coastal Council's Charleston office to discuss the DHEC study of Campbell Creek. Plaintiff's Trial Exhibit 142.

68. Portions of the remediation could not take place without other agencies' approval. The United States Army Corp of Engineers granted a permit on June 28, 1990, to construct a truck turning pad at the burn site area because the pad, as built, encroached on jurisdictional wetlands. Lane Deposition Testimony, p. 68, I. 24—p. 69, I. 13. In addition, two permits were required by the South Carolina Coastal Council in connection with the remediation. One of the permits addressed disturbance of the wetlands in remediating the lagoon site. *See*, Lane Deposition Testimony, p. 67, I. 18—p. 69, I. 23; p. 70, I. 13—p. 71, I. 2; Plaintiff's Trial Exhibit 296. The Coastal Council also was required to approve the NPDES permit renewal. Plaintiff's Trial Exhibit 258. In addition, the Coastal Council also approved the sampling that was done at the site. Plaintiff's Trial Exhibit 215. The Coastal Council also sought information about and approved the remediation plan and had substantial involvement with the Lobeco plant during this time period. Plaintiff's Trial Exhibit 265.

69. The United States Environmental Protection Agency ("EPA") also reviewed G & E's April 1986 preliminary investigation report. EPA made suggestions regarding the planned investigation. Plaintiff's Trial Exhibit 182. In correspondence to the parties, DHEC included these EPA comments as well as its own comments. EPA was contacted regarding the PCB contamination level. Lane Deposition Testimony, p. 124, I. 15—p. 125, I. 2. The Lobeco PCB remedia-

tion followed applicable federal requirements for post-remediation levels of PCBs. Plaintiff's Trial Exhibit 259. EPA reviewed the remediation and made a determination that the Lobeco plant site need not be placed on the National Priority List. Plaintiff's Trial Exhibit 266. EPA was also provided with a copy of Lane's Final Report relating to the dig and haul. Lane Deposition Testimony, p. 124.

70. Toward the end of the dig and haul portion of the remediation, local officials viewed the plant with Lobeco Product's Plant Manager, John Meeks. Meeks Testimony, Vol. II, p. 25. These officials included members of the Beaufort County Council, the Beaufort County Administrator and others. *Id.*

71. Substantial publicity was generated in the print media about the PCB contamination at the Lobeco plant site and its cleanup. A number of articles appeared in various newspapers across the state of South Carolina, beginning in December 1984. Plaintiff's Trial Exhibit 128. Articles appeared in Charleston, Columbia, Beaufort and Hilton Head Island newspapers. The articles detailed the finding of contaminants at the Lobeco site, including PCBs. The articles reported DHEC's involvement with the site as well as the involvement of other entities such as Beaufort County Council and the Sierra Club. The submission of the Plan of Study to DHEC is one of the items reported. A DHEC press release was reprinted in 1986. The ongoing remediation was also reported in two articles. Residents were advised to "Watch Lobeco" in an editorial in 1987. The completion of the dig and haul portion of the remediation was also reported. Plaintiff's Trial Exhibit 128.

72. The public was involved in the selection of the remedy at Lobeco. Meeks Testimony, Vol. I, p. 118. John Meeks was the Plant Manager at the Lobeco site, from 1979 to the present. Meeks Testimony, Vol. I, p. 68. Mr. Meeks himself spoke to a number of residents during the initial investigation of the PCB contamination. Meeks Testimony, Vol. I, p. 116–117. Following the initial DHEC report, some of the residents were concerned about the quality of their wellwa-

ter and a well survey was conducted to determine the extent of possible contamination. The well survey revealed that no PCB contamination of ground water existed in neighboring wells. Plaintiff's Trial Exhibit 260.

73. During the creation of the Remedial Action Plan, Mr. Meeks continued to speak with neighbors in Lobeco and residents of the town of Beaufort. Meeks specifically talked to residents about the remedial alternatives being considered. Meeks Testimony, Vol. II, p. 24. Meeks informally also discussed the proposed remediation with at least 50 residents. *Id.* at Vol. II, p. 15.

74. Residents informed Meeks that whatever remedial alternative was selected, they wanted it to include removal of the PCB contaminated soil from the property. Meeks Testimony, Vol. I, p. 117–118. The residents did not want the PCB soil to be entombed on site or otherwise remediated on-site. *Id.* RMT and Lane took the public's preference for removing the PCB-contaminated soil from the Lobeco plant site into consideration in arriving at their recommendation for the dig and haul remedial alternative. Lane Deposition Testimony, 85–86. In reaching their conclusion, RMT and Lane relied on the comments of John Meeks and another Lobeco employee regarding the neighbors' preferences. *Id.*

75. Following nearly three full weeks of trial, the Advisory Jury responded "yes" to the following Special Interrogatory:

> Do you, the jury, find that the plaintiff, American Color and Chemical Corporation, has shown by a preponderance of the evidence that during the remediation of PCBs from the Lobeco, South Carolina site there was a reasonable opportunity for meaningful public comment, including during the process of selecting a specific method for cleaning up the site?

Based upon the jury's finding, the Court specifically finds that there was a reasonable opportunity for meaningful public comment during the investigation and remediation of the PCB contamination at the site, including during the process of selecting a specific method for cleaning up the site.

76. As of the time of trial, further remediation work relating to the PCB contamination was on-going at the Lobeco plant site pursuant to a Second Consent Order (91–12–W) dated March 25, 1991. This Second Consent Order addresses the impact of the PCB contamination upon the groundwater. Plaintiff's Trial Exhibit 24. DHEC was actively involved in the negotiation of the Second Consent Order and in the groundwater monitoring undertaken pursuant thereto. Plaintiff's Trial Exhibits 239, 243, 244, 246, 247, 250, 306, 307, 308, 310, 311, 312, 318, 320, 323, 326.

77. The Second Consent Order clearly addresses PCB contamination. Tenneco refused to become a party to the Second Consent Order and Tenneco has failed to fund any of the activity addressed by the Second Consent Order. Specifically, the Second Consent Order references the investigation of PCBs and the remediation of PCBs at Lobeco. Furthermore, the Second Consent Order recites that a need remains "to define the horizontal and vertical extent of groundwater contamination at certain areas at ... Lobeco." Under the Order, American Color and Lobeco Products agreed to submit "a Plan of Study ... to determine the full extent and degree of groundwater and soil contamination at the Lobeco site in the areas impacted at/by the abandoned burn site, abandoned lagoon site" and other areas. Plaintiff's Trial Exhibit 24.

78. A Plan of Study was submitted to DHEC under the Second Consent Order. Plaintiff's Trial Exhibit 17. Work is currently proceeding under the Plan of Study. Testimony of Richard Koch, Vol. V, p. 45–46. DHEC has not yet approved the work, nor is it complete. Meeks Testimony, Vol. I, p. 113.

79. The court finds that the work set forth in the Second Consent Order relates to Tenneco's release of PCBs into the Lobeco environment. Although Tenneco contends that it is not responsible for the current groundwater monitoring and costs associated therewith, the court finds that absent the release of PCBs by Tenneco, the groundwater monitoring encompassed in the Second Consent Order would not have been required by DHEC.

80. Tenneco admitted that American Color undertook cleanup activities required by DHEC and at substantial cost. These costs are "response costs" as defined in CERCLA. Amended Answer and Counterclaim at ¶ 30. The court finds that American Color incurred past response costs of $6,023,722.35 as evidenced by documentary evidence presented without objection by American Color. Plaintiff's Trial Exhibit 331.

81. American Color complied with all of the requirements of the National Contingency Plan. Tenneco has admitted that fact but contends that there was no opportunity for public comment. Trial Transcript, Vol. V, pp. 132–138, 146–151.

82. Tenneco's contractual defense to American Color's CERCLA claim is based on the 1973 Agreement. Amended Answer and Counterclaim at ¶¶ 101–124. Tenneco contends that the indemnification provisions thereof preclude recovery by American Color of its CERCLA response costs.

83. Within certain limits, American Color did agree to indemnify Tenneco for "contingent liabilities" as defined in the 1973 Agreement. American Color's liability, however, was limited to $500,000 if the contingent liability was known to Tenneco at the time the 1973 Agreement was executed. Plaintiff's Trial Exhibit 25 at ¶ 12. American Color did not intend to indemnify Tenneco for environmental contamination Tenneco knew about at the time the 1973 Agreement was executed, but failed to disclose to American Color. Id.; Testimony of Wallace Collins, Vol. IV, pp. 13–14, 58–59.

84. Lew Palombo knew of the releases of PCB into the environment at Lobeco at the time the 1973 Agreement was signed. American Color, however, did not know of the PCB contamination. Hopkins Testimony, Vol. III, p. 98–99, and Tenneco did not disclose its knowledge about the PCB contamination to American Color prior to execution of the 1973 Agreement. Hopkins Testimony, Vol. III, p. 92–127; Collins Testimony, Vol. IV, p. 48–49. The 1973 Agreement therefore does not preclude recovery by American Color of its CERCLA response costs from Tenneco.

## CONCLUSIONS OF LAW

1. CERCLA § 107 provides a right of action in favor of a private party who has expended costs in the remediation and removal of hazardous substances released or generated by the owner/operator of a facility. 42 U.S.C. § 9607(a)(2)(B). American Color, as the party seeking reimbursement or prospective relief must establish four elements:

a. The Lobeco plant site is a "facility", pursuant to 42 U.S.C. § 9601(9);

b. Tenneco is a "covered person" as defined in 42 U.S.C. § 9607(a);

c. A "hazardous substance" as defined in 42 U.S.C. § 9601(14), was "released" at or from the site, as release is defined in 42 U.S.C. § 9601(22), during the time Tenneco acted as the owner/operator or generator; and

d. American Color has incurred necessary "response costs" in the remediation of the site and/or removal of the hazardous substances, which costs are not inconsistent with the National Contingency Plan ("NCP") relating to such action. 40 C.F.R. § 300.700(c)(3)(i).

2. Tenneco has admitted the first three of these four elements that were alleged by American Color in its Amended Complaint, which elements are necessary to prove a CERCLA claim.

3. CERCLA was enacted for the "protection and preservation of public health ..." *General Electric v. Litton Business Systems,* 715 F.Supp. 949, 961 (W.D.Mo. 1989), *aff'd,* 920 F.2d 1415 (8th Cir.1990). Such statutes are "to be given an extremely liberal construction for the accomplishment of their beneficial objectives." *Id.* at 961. The goal of § 107 is *"to induce* [private parties] *voluntarily* to pursue appropriate environmental response actions ..." *Id.* at 962 (emphasis in original). CERCLA was enacted "to encourage ... private cleanup efforts, ... to preserve the limited resources of the government and the Superfund, and to make those responsible bear the burden of the conditions they created." *Con–Tech Sales Defined Benefit Trust v. Cockerham,* 1991 WL 209791, at *4 (E.D.Pa.1991).

4. Tenneco has admitted that the 1990 NCP governs this remediation. Trial Transcript at Vol. IX, p. 51. The court agrees. The 1990 NCP controls if the remediation was underway as of April 9, 1990, the enactment date of the 1990 NCP. This is clearly true of the PCB remediation involved in this case. 55 Fed.Reg. 8795 (1990); *Tri–County Business Campus Joint Venture v. Clow Corp.*, 792 F.Supp. 984, 990 (E.D.Pa.1992); *ConTech, Supra,* at *8.

5. The 1990 NCP clarified the 1985 NCP. 55 Fed.Reg. 8666 (1990).

6. The standard for compliance under the 1990 NCP is substantial compliance, not strict compliance. 40 CFR 300.700(c)(3)(i). "Immaterial or insubstantial" deviation from the items set forth in the 1990 NCP will not cause the cleanup to be deemed inconsistent. 40 CFR § 300.700(c)(4).

7. The NCP is a regulatory framework governing the cleanup of hazardous wastes. "The NCP is not intended to provide complex and detailed site-specific decision-making criteria." *General Electric,* 715 F.Supp. at 962. The NCP addresses the method of site investigation and analysis of remedial alternatives. The regulations suggest the creation of certain documents that fulfill these goals.

8. Tenneco argued that the only NCP deficiency was the failure to hold a public hearing. Trial Transcript, Vol. V, pp. 132–138, 146–151. Tenneco is thus precluded from any argument that the documentary requirements of the NCP were not fulfilled. The Court finds, however, that documents substantially similar to the documents suggested in the 1990 NCP were prepared in this case. The G & E Report constituted the remedial investigation portion of the remedial investigation ("RI")/feasible study ("FS") (RI/FS). Plaintiff's Trial Exhibit 1. The Lane Plan of Study constituted the RI work plan. *See,* Lane Deposition Testimony p. 46, I. 6–11; p. 47, I. 20—p. 48, I. 3. Plaintiff's Trial Exhibit 2. Section 8 of the RMT September 1988 Report constitutes the FS portion because it considers and discusses the various remedial alternatives. Plaintiff's Trial Exhibit 5. Section 9 of the RMT Report sets forth the Remedial Action Plan. *Id.* The Remedial Design ("RD")/Remedial Ac-

tion ("RA") (RD/RA) phase is also substantially represented in the documents submitted by the parties to DHEC. The RMT Project Manual (which took the form of a construction bid document) is the RD. Plaintiff's Trial Exhibit 3. DHEC approved RMT's Sampling and Analysis Plan (SAP) in October 1989. Plaintiff's Trial Exhibit 271. OHM Corporation was selected to perform the Remedial Action (RA). In January 1990, OHM submitted its contractor's RA work plan to DHEC. DHEC's acceptance of Lane's Final Report on the dig and haul portion of the remediation constitutes a Final Report under the NCP. *See* Plaintiff's Exhibit 303. A Health and Safety Plan was also submitted. Plaintiff's Trial Exhibit 8.

■ 9. The 1990 NCP requires an opportunity for public comment concerning the selection of a response action and calls for meaningful public participation in that process. A public hearing is not expressly required by the 1990 NCP. 40 CFR § 300.700(c)(6).

■ 10. Compliance with state requirements that are substantially equivalent to those found in the 1990 NCP, or that provide substantially equivalent protections as those found in the 1990 NCP, constitutes substantial compliance with the public participation requirement of the 1990 NCP. 40 C.F.R. § 300.700(c)(6); *See also General Electric,* 715 F.Supp. at 961.

■ 11. The extensive involvement of government agencies charged with protection of the public interest may serve as a substitute for public comment. *General Electric,* 715 F.Supp. at 961.

12. The court finds that the rationale of the *General Electric* court controls this action, although this action arises under the 1990 NCP, whereas the *General Electric* action arose under the 1985 NCP. The 1990 NCP did not radically change the public participation element of the 1985 NCP nor was it intended to increase the difficulty of a plaintiff in recovering necessary response costs. Indeed, the opposite is true. Compare 40 C.F.R. § 300.71(a)(2)(ii) to 40 C.F.R. § 300.700(c)(6). Neither version of the NCP

expressly requires a public hearing, but both require an opportunity for meaningful public comment. *Id.*

13. *General Electric* recognizes that state agencies charged with duties involving overseeing the remediation of hazardous wastes, fulfill the function of public participation where parties voluntarily undertake to act pursuant to the agency's instructions and with the agency's comprehensive input. 715 F.Supp. at 961–963. This court agrees with that reasoning and recognizes that governmental agencies charged with protection of the public interest may serve as substitutes for participation by individual members of the public, at least where the agency is actively involved in all aspects of the investigation, planning, and remediation of a release of a hazardous substance, as was the case here. The court also notes that the Fourth Circuit has not rejected *General Electric* and has seemingly implicitly adopted its rationale. *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.,* 702 F.Supp. 1229 (E.D.N.C.1988) (Court considered arguments as to whether a party's compliance with meager state requirements satisfied the NCP, implicitly indicating that the reasoning of *General Electric* was to be followed, because the consideration would have been rendered unnecessary by a rejection of *General Electric*).

14. The response costs incurred by American Color were in substantial compliance with the 1990 NCP.

15. The court agrees with the Advisory Jury's answer to the Special Interrogatory that the public was provided with an opportunity for meaningful public comment concerning the selection of a response action. The fact that the public actually influenced which remedial alternative was chosen, indeed influencing the parties to select the most expensive alternative of those under consideration, has influenced the Court's decision that the public had a meaningful opportunity to participate in the remediation process.

16. The newspaper coverage outlined above, the Meeks' and other Lobeco employees' communications with individual members of the public, and participation of the public's elected officials such as the Beaufort County Council adequately apprised the public in this very small community of the remediation, so that the public could have participated even more in the selection of a remedial alternative if it had wanted to.

17. In addition, under *General Electric,* the remediation substantially complied with the NCP. In this case, DHEC is statutorily charged with protecting the environment in South Carolina and to "abate, control and prevent pollution." S.C.Code Ann. § 48–1–20; *See also SC DHEC v. Armstrong,* 293 S.C. 209, 359 S.E.2d 302 (1987). The substantial involvement of DHEC and other government agencies in the investigation and remediation served as a substitute for additional public comment, especially in light of DHEC's duty to protect the public.

18. Public agencies were adequately apprised of and involved in, the remediation, so that they did participate, and could have participated, in the cleanup to the fullest extent.

19. Additionally, the requirements of the DHEC Consent Orders were substantially equivalent to those found in the 1990 NCP. The parties' performance under the DHEC Consent Orders therefore substantially fulfilled the requirements of the 1990 NCP.

20. Although Tenneco contended at trial that a public hearing should have been held regarding the Remedial Action Plan, the Court finds that sufficient information regarding the remediation was disseminated to the public either directly, or through state and federal agencies representing the public interest. The court's conclusion is based in large measure upon Tenneco's failure to proffer any witness who was dissatisfied with the remediation or who would have chosen a different remedial plan, including Tenneco itself. Moreover, Tenneco participated, at least equally, in all phases of the decision-making process regarding the remedy selection in the Remedial Action Plan, and itself suggested and persuaded the other parties to agree to the exclusion of an NCP-consistency clause in the Amended Consent Order. The Court has also considered the fact that DHEC itself did not require a public hearing. The Court is impressed as well with the fact

that the remedial plan chosen was the most comprehensive, most expensive and most thorough course of remedial action among the alternatives considered, which achieved a permanent remedy, forever decreasing the volume, toxicity and mobility of the PCB contamination. *See e.g.,* Towe Testimony, Vol. VI, p. 99–100; Plaintiff's Trial Exhibit 5A § 9.

■■■■ 21. Tenneco waived its right to insist on compliance with the NCP when it suggested that NCP-compliance be deleted from the Amended Consent Order. *See Lyles v. BMI, Inc.,* 292 S.C. 153, 355 S.E.2d 282, 285 (1987) (waiver is the intentional relinquishment of a known right). Tenneco purposefully removed the language from the Amended Consent Order and cannot later contend that compliance was required. Additionally, Tenneco is estopped from contending that American Color cannot recover under CERCLA because of the remediation's alleged technical non-compliance with the NCP, as Tenneco participated on at least an equal basis in the decision-making process regarding the selection of the remedial alternative for the cleanup of the PCB contamination, which contamination it alone created at the Lobeco plant site. *See Standard Fire Ins. v. Marine Contracting and Towing Co.,* 301 S.C. 418, 392 S.E.2d 460, 462 (1990).

22. Tenneco is liable for all past and future American Color response costs associated with the Lobeco plant site remediation. But for the presence of PCBs, the Court finds that DHEC would not have ordered the remediation encompassed in the three Consent Orders. These costs include those incurred by American Color under the Second Consent Order, and any future costs associated with the incidental remediation of slight non-PCB contamination occurring as the result of the DHEC-ordered PCB remediation and investigation.

■■■ 23. Tenneco is legally obligated to reimburse American Color for its response costs. This court previously determined that Tenneco is estopped under Fed.R.Civ.P. 8(c) from raising the defense that it was not the proper defendant.[2]

24. Tenneco's admission of the CERCLA elements as set forth above constitute sufficient positive evidence of its liability for American Color's claims. Tenneco cannot now avoid or disclaim such admissions.

25. Tenneco contends that the indemnification provisions in the 1973 Agreement bar American Color's CERCLA claim, on the purported ground that American Color agreed to indemnify Tenneco for all contingent liabilities. Amended Answer and Counterclaim ¶ 85; 101–120.

---

**2.** At the close of Plaintiff's case Tenneco moved under Fed.R.Civ.P. 50 for judgment as a matter of law on the ground that it was not the proper defendant because it was not a party to the 1973 Agreement. Transcript at Vol. V, p. 154–156. The court denied the motion because Tenneco had *itself* admitted nearly all of the critical elements of the CERCLA claim; Tenneco admitted that jurisdiction and venue over *it* were proper, Amended Answer and Counterclaim ¶¶ 4 and 5; and Tenneco admitted that *it* entered into negotiations to sell the Lobeco plant. *Id.* at ¶ 43. Moreover, in answers to this Court's Local Rule 7.06 Interrogatories, Tenneco admitted that *it* was properly identified in Plaintiff's Amended Complaint. Tenneco did not set forth any detailed factual basis to support a defense that it was purportedly the wrong corporate entity for plaintiff to sue and Tenneco did not state that any person or legal entity other than *it* was potentially liable in whole or in part to the Plaintiff. Tenneco never raised the issue in response to discovery requests that clearly sought information from Tenneco Chemicals rather than Tenneco. In light of Tenneco's failure to raise the

issue after three years of pleading and discovery and more than one full week of trial, the Court ruled that Tenneco is estopped under Rule 8(c) from asserting the defense.

Tenneco was required by Rule 8(c) to raise the question of whether it was improperly named in its Amended Answer and Counterclaim, because the issue constitutes an avoidance under 8(c). Tenneco's failure to plead the affirmative defense waives the defense. *Lubecki v. Omega Logging, Inc.,* 674 F.Supp. 501, 509 (W.D.Pa.1987). *See also Zielinski v. Philadelphia Piers, Inc.,* 139 F.Supp. 408 (E.D.Pa.1956); *Weade v. Trailways of New England, Inc.,* 325 F.2d 1000 (D.C.Ct. 1963). Furthermore, motions relating to the status of a party should be made without delay in order to protect the Court and the parties from wastefully spending significant amounts of their limited resources of time and money preparing and trying a case against a purportedly misidentified party. *See, Whelan v. Abell,* 953 F.2d 663, 672–673 (D.C.Ct.1992); *Ilan–Gat Engineers, Ltd. v. Antigua Intern. Bank,* 659 F.2d 234, 242 (D.C.Ct.1981).

26. As discussed above, however, American Color's indemnification liability is limited to at most $500,000 for things known to Tenneco at the time the 1973 Agreement was executed. Plaintiff's Trial Exhibit 25 at ¶ 12.

27. Because Tenneco knew of the PCB contamination as of the execution of the 1973 Agreement, American Color's liability under the 1973 Agreement is limited to at most $500,000. The 1973 Agreement does not preclude recovery by American Color of its CERCLA response costs.

28. The jury returned a verdict in favor of Tenneco for $500,000 on its contractually-based Counterclaim. While this verdict operates as a set-off to the judgment herein granted to American Color, it in no way operates to preclude recovery by American Color of its past and future response costs.

29. The other affirmative defenses or claims for set-off that Tenneco asserted in response to the CERCLA claim, including laches, and American Color's alleged failure to exercise due care are without merit.

■ 30. Tenneco also contends that American Color's CERCLA claim should be reduced or set-off in proportion to American Color's own liability under 42 U.S.C. § 9613(f). Amended Answer and Counterclaim at ¶ 93. In confronting Tenneco's claim, the Court's mandate is to render an equitable result, based upon factors the Court deems appropriate. 42 U.S.C. § 9613(f)(1); *See also Environmental Transportation Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 507 (7th Cir.1992); *U.S. v. S.C. Recycling and Disposal, Inc.*, 653 F.Supp. 984 (D.S.C.1986), aff'd in part and vacated in part, *U.S. v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988). A party seeking to allocate costs has the burden of proving that allocation is appropriate in a particular case. 969 F.2d at 508. Tenneco has not met its burden of proving that the costs of remediation should be apportioned in a manner that reduces American Color's entitlement to relief.

31. Allocation of response costs is determined on a case by case basis. 969 F.2d at 509. A "court may consider any factors appropriate to balance the equities in the totality of the circumstance." *Id.* In making the determination the court "may consider several factors, a few factors, or only one determining factor", such as the relative fault of the parties in contributing to the release. *Id.*

32. Among the factors which have been applied are those suggested in an unsuccessful amendment to CERCLA.[3] *Bell Petroleum Services, Inc. v. Sequa Corp.*, 3 F.3d 889 (5th Cir.1993); *In re Hemingway Transport, Inc.*, 993 F.2d 915 (1st Cir.1993).

33. Tenneco did not introduce evidence that specifically addressed any equitable factor. The evidence which is in the record compels the conclusion that American Color is entitled to full recovery of its response costs. Tenneco is exclusively responsible for the release of PCBs at the site. *See Central Maine Power Co. v. O'Connor Co.*, 838 F.Supp. 641, 645–47 (D.Me.1993) (holding that no future costs for the remediation of lead should be allocated to the party which did not send lead to the contaminated site). PCBs were the contaminant of concern at Lobeco and drove the remedy; American Color did not contribute to the release of the hazardous substance in question; was not involved in the generation, transportation, storage or disposal thereof; was not responsible for exercising due care in connection therewith; and fully cooperated (and contin-

---

**3.** The so-called "Gore factors" are as follows:

(i) the ability of the parties to demonstrate that their contribution to a discharge[,] release or disposal of a hazardous waste can be distinguished;

(ii) the amount of the hazardous waste involved;

(iii) the degree of toxicity of the hazardous waste involved; .

(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

3 F.3d at 899–900.

ues fully to cooperate) with state and local officials in the investigation and remediation thereof. To the extent the Gore factors are applicable, the Court concludes that Tenneco is not entitled to contribution from American Color or other apportionment of American Color's costs and is not entitled to a finding that some portion of American Color's response costs should be allocated to American Color.

34. The Court finds that Tenneco is fully liable under CERCLA for all past and future response costs incurred by American Color in connection with the investigation and remediation of the release of hazardous substances at the Lobeco site.

35. Tenneco also contends that imposition of liability under CERCLA is unconstitutional. Amended Answer and Counterclaim at ¶ 94. This Court finds that imposition of CERCLA liability is not unconstitutional. Retroactive application of CERCLA does not violate the due process clause because such an application is supported by a "legitimate legislative purpose furthered by rational means ..." *U.S. v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 733 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *U.S. v. Kramer*, 757 F.Supp. 397, 429 (D.N.J.1991).

36. American Color is entitled to judgment on its CERCLA claim. Judgment is hereby entered in favor of American Color and against Tenneco in the amount of $6,000,000, together with prejudgment interest as set forth below.

37. CERCLA specifically provides for the recovery of prejudgment interest at 42 U.S.C. § 9607(a)(4). Prejudgment interest in this case shall run from November 14, 1990, the date the American Color filed its Complaint. The filing of a complaint constitutes a written demand for payment which is required under CERCLA. *In the Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889, 907 (5th Cir.1993). CERCLA refers to the interest "specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of Chapter 98 of title 26." 42 U.S.C. § 9607(a)(4). Pursuant

to the referenced statute, the prejudgment interest rate shall be "equal to the current average market yield on outstanding marketable obligations of the United States." 26 U.S.C. § 9507(d)(3)(c). Excess Superfund money investments "may be made only in interest-bearing obligation(s) of the United States." 26 U.S.C. § 9602(b)(1). Based on this directive, the interest rates have been computed by averaging the auction average annual rate of six (6) month treasury bills and the average annual rate of composite long term government securities for that year. These rates are published by the Federal Reserve Board. Interest rates used are as follows:

| | |
|---|---|
| 1990 | 7.07% |
| 1991 | 7.07% |
| 1992 | 5.64% |
| 1993 | 4.84% |
| 1994 | 4.93% |
| 1995 | 5.50% |

The interest must be compounded. *U.S. v. American Cyanamid Co.*, 786 F.Supp. 152, 164 (D.R.I.1992).

38. American Color presented evidence by way of the Affidavit of Tracy Amos, CPA as to the appropriate method of computing prejudgment interest in this case. Interest was computed beginning on November 14, 1990. Interest was accrued and added to the principal balance annually. Expenditures by American Color after the complaint was filed bore interest from the date of each disbursement. The calculations submitted by American Color were totalled as of June 30, 1994. A per diem amount based on the current year's interest rate was also submitted.

39. This court has determined that the jury verdict on behalf of Tenneco operates as a set-off or recoupment against the judgment entered herein in favor of American Color. The jury found that under the 1973 Agreement American Color was obligated for the first $500,000 of its expenses, because the PCB contamination was a contingent liability about which Tenneco knew at the time the 1973 Agreement was executed. American Color in fact paid $500,000 of these costs. The jury verdict does not therefore represent an independent recovery on behalf of Tenneco, but is an offset.

40. American Color is therefore entitled to prejudgment interest on the sum of $5,500.000, to be computed pursuant to the interest rates set forth above in paragraph 37.

41. Judgment is also entered in favor of American Color on its declaratory judgment claim as to all additional costs associated with the Lebeco remediation, from the date the trial concluded (November 19, 1994) and including all future costs.

42. American Color has sought attorneys' fees in its Amended Complaint. The United States Supreme Court has ruled that attorneys' fees incurred in litigating a response cost action under § 107 of CERCLA are not recoverable. The attorneys' fees claim is therefore moot. *Key Tronic Corp. v. United States*, —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994).

**IT IS SO ORDERED.**